EDWARD M. KERR vs. MOSES POTTER.—*June*, 1848.

The appellant and appellee entered into an agreement in writing, by which the
 former agreed to employ the latter as salesman and clerk in his store, and
 allow him for his services, one-fourth of the net profits of the business, and
 which further declared " that thereby the said" appellee " is not made a
 partner in trade of the said" appellant, " but that the allowance of one-fourth
 of the net profits, after deducting expenses," &c. " is a compensation for the
 services of the" appellee " in lieu of clerk hire." *Held,*
That this agreement is conclusive, to show that the parties were not partners,
 *inter se*, and however the appellee may be held liable as to third persons, he
 has none of the rights and equities of an actual partner,—and therefore, has
 no more right to call for the interposition of a court of equity, on the ground
 of lien, than any other creditor of the appellant.
If he performed acts, or stood by and saw others perform them, which would
 render him liable to the creditors of the concern, the credit given was
 voluntary, and gave him no other equity than would result to any other
 person who should become responsible for the appellant's indebtedness.
There being here no controversy between creditors, but simply whether the
 appellee was the actual partner of the appellant, this case is not analogous
 to the case of *ex parte Digby* and *ex parte Buckston*, in 38 *Eng. C. L.
 Rep.* 495.

APPEAL from the Court of Chancery.

The appellee filed his bill on the 8th September, 1846,
alleging, that on the 23d January, 1846, the complainant and a
certain *Edward M. Kerr* commenced, in the city of *Baltimore*,
a wholesale and retail "*Queensware and China business*," under
the name and firm of " *E. M. Kerr & Co.*" That the business
of said firm was large and heavy, and the liabilities and obliga-
tions outstanding and unpaid are very considerable, as are also
the debts now due the same, and the goods and merchandise
in its possession. That said *Kerr* has been extensively engaged
in business on his private and individual account, and on or
about the 21st August, 1846, stopped payment on some of his
paper given for his individual liabilities, and is now greatly
embarrassed and wholly insolvent. That such insolvency has
not been occasioned by the operations and business of said firm,
which have been profitable, but by transactions and business on
his individual and private account. That since he became

insolvent, he has applied and used a part of the property and means of the firm in payment of his individual debts, and that attachments have been issued by his individual creditors against the property and effects of said firm, and complainant believes said *Kerr* will, unless restrained by this court, further proceed so to apply and use the property and effects of said firm.

The bill further charges that *Kerr*, when said business was commenced, agreed to furnish all the capital required in its management, to furnish and keep up a full stock of goods necessary and proper therefor, and was to sign all bonds, notes or other obligations for the payment of money or performance of any contract connected with said business, and was to pay all the debts and liabilities of the firm, and have the management thereof. That complainant was to act as salesman and general clerk, and was to receive, for his services, one quarter of the net profits, after deducting all expenses, and interest on the capital at the rate of six *per cent. per annum*, and was to receive for his support from said concern $ 83 33 per month, afterwards increased to $100 per month, which monthly payments were to be advanced from the net profits, and deducted from complainant's one quarter share thereof at the end of each year, and complainant was not to be held responsible for the debts and liabilities of the firm, all of which were to be paid by *Kerr*. That immediately after the commencement of said business, complainant was held out to all persons dealing with said firm, as a partner, and as jointly liable with *Kerr* for the liabilities thereof. That *Kerr* caused signs to be placed at the store in *Baltimore* street in said city, which evidenced to all persons reading the same, that complainant and said *Kerr* were partners and jointly composed the firm of "*E. M. Kerr & Co.*" That various circulars were prepared and issued by *Kerr* and complainant, sometimes by one and sometimes by the other, indicating the same fact, and that in various publications in newspapers in *Baltimore* and elsewhere complainant was held out as a member of said firm, and a partner of *Kerr* and as jointly responsible with him for the debts and liabilities of the firm. That though *Kerr* in his transactions

with third persons, spoke of and held out complainant as his partner, and as a member of said firm, and has thereby, as complainant believes and charges, made him liable for all debts created in the regular and legitimate business of the firm, yet he has not, in other respects, treated complainant as a partner, and has failed and refused to account to him of his one-fourth of the net profits, and to take an account of stock in trade in each year as he was bound to do under his said contract, and has retained exclusive possession and control of the books and effects of the firm.  That *Kerr* has failed to meet all the liabilities of the firm as they matured, and in this respect has violated his said contract, and has failed to keep the business well stocked with goods, suitable for carrying on the same. That since the insolvency of *Kerr* on his individual liabilities, he has told complainant that he was jointly liable with himself for all the debts of the firm; whereupon, complainant insisted, that the means of the firm should be applied, in the first instance, to pay its liabilities, and a settlement be made, and complainant paid his share of the profits, which settlement and application, *Kerr* refused to make.  That he is advised, and therefore charges, that he is jointly responsible as a partner for all the debts of the firm, exceeding, as he believes, the sum of $20,000, and if he is held personally responsible for them, he is entirely ruined and hopelessly insolvent.  That he believes the property and debts of the firm will be nearly, if not quite, sufficient to pay the partnership liabilities.  That the business has been extremely profitable, and upon a full and fair adjustment of accounts, complainant will be entitled to a considerable sum over and above his said monthly payments; but that *Kerr* has refused to make such adjustment, or to come to any account in relation thereto.  That by reason of the insolvency of said *Kerr*—his improper application of the partnership means to the payment of his individual debts—his refusal to account and to apply the partnership property in payment of the partnership debts, and his holding exclusive possession of the books and effects thereof, complainant is liable for a large amount of partnership debts, without the

means of enforcing an equitable adjustment of the affairs of the firm, except through the interposition of this court. That *Kerr* has refused to apply the partnership property in payment of the partnership liabilities, but without the knowledge and consent of the complainant, has applied a portion thereof in payment of his individual debts: and complainant apprehends and believes he will continue to make such application, unless restrained by this court, and will thereby greatly injure the partnership creditors, whereby the complainant will be totally ruined. That for these reasons he has become very desirous to put an end to said partnership, and has, in fact, applied to *Kerr* to dissolve the same, and all connection in business, and to come to an account in relation thereto, all which he has refused to do.

The bill then prays for the appointment of a receiver, an injunction restraining *Kerr* from selling, disposing of, or retaining from the receiver any of the partnership effects, or collecting any debts due thereto, for a dissolution of said partnership and for general relief.

On the same day, the Chancellor (BLAND) ordered the injunction as prayed, and the application for a receiver to stand over until the coming in of the answer and further order.

*Kerr*, in his answer filed on the 26th September, 1846, avers that he has been engaged in business in *Baltimore*, carrying on a wholesale and retail "*Queensware and China business*" since the year 1839, under the name, style and firm of "*E. M. Kerr & Co.*" and was so engaged when this bill was filed. That this was the name of a pre-existing firm of which respondent was the active member; but for a considerable period prior to the 23d January, 1845, he had become its sole owner and proprietor, and continued business under that name because it was well known and established, but in many instances, using indifferently his own proper name of "*E. M. Kerr*," and said name of "*E. M. Kerr & Co.*" That on the 23d January, 1845, respondent and complainant entered into an agreement, which is exhibited—the true construction and effect of which he submits to the court, admitting that as far

as the allegations of the bill agree therewith, they are true; but in so far as they differ therefrom, are untrue. But defendant denies that by this agreement, complainant became his partner, or thereby acquired any communion of property with defendant in the stock in trade, or in the rights, or credits, or effects of the firm; and he affirms that the allowance to the complainant of a share of the profits, was only a mode of compensating him for his services as clerk, and in lieu of clerk hire. That even the limited connection between the parties created by this agreement, was dissolved before the filing of the bill, by a notice from complainant to defendant to that effect, as the agreement provided for. He denies that he has ever refused to come to a full and fair settlement with complainant,—but, on the contrary, avers that he has always been willing to account and settle with him. That complainant has in various ways and without authority, received and appropriated to his own use, more of the monies of the defendant, than his portion of the profits entitled him to receive.

The answer then specifies some special instances of such alleged appropriation, and then avers, that upon a fair settlement, the complainant will be found in debt to defendant. That all the goods purchased in the business, the notes made, and the credits given, were made and given in the name of defendant to whom, and to whom alone, the creditors looked for payment, the complainant at the time of the agreement being notoriously and utterly insolvent. He denies that he ever represented or held the complainant out to the public as his partner, or authorized or gave his sanction to any act which could have that effect. He avers that he has always paid his business notes, none having been permitted to lie over until after the service of the injunction, though he admits that he had loaned notes to a considerable amount to a mercantile firm in *Baltimore*, which not being paid at maturity, attachments had issued upon them, and been levied upon certain credits of defendant in *Pennsylvania*, though if these accommodation notes should be paid by the persons to whom they were loaned, he yet hopes to go on prosperously with his business.

The agreement referred to in the answer, and exhibited with it, is as follows:—

"Articles of agreement, made and concluded this twenty-third day of January, in the year of our *Lord* one thousand eight hundred and forty-five, by and between *Edward M. Kerr* and *Moses Potter*, both of the city of *Baltimore*, and State of *Maryland, witnesseth*, that whereas the said *E. M. Kerr* has agreed with the said *Moses Potter* to employ him as salesman and general clerk in his store, No. —— *Baltimore* street, in the city of *Baltimore*, and to allow him for the faithful performance of his services in that capacity, one-quarter of the net profits that may arise from the business, after deducting all expenses, and the interest on amount of the capital stock put in said business, at the rate of six *per cent. per annum*, and to pay the said *Moses Potter* from the concern for his support, the sum of eighty-three dollars thirty-three cents per month, which said monthly payments are to be advanced out of the net profits coming to the said *Moses Potter*, and to be deducted from his one-quarter share of the net profits at the end of each year. In consideration of which allowance, the said *Moses Potter* hereby covenants and agrees with the said *E. M. Kerr*, to give his sole and undivided attention to the interest and prosperity of the business, and bring to its aid not only his own labors, but will, as far as in his power lies, enlist the good will and invoke the aid of his friends and acquaintances, both in town and country, in its behalf.

"And the said *E. M. Kerr*, on his part, covenants and agrees with the said *Moses Potter*, that he will to the best of his ability, and with a view to the profits of the said business, purchase and keep the concern well stocked with goods, suitable for the carrying on of the said business. And it is hereby declared to be the meaning of the articles of agreement aforesaid, that thereby the said *Moses Potter* is not made a partner in trade of the said *E. M. Kerr*, but that the allowance of one-fourth of the net profits, after deducting the expenses of the business, and also deducting interest on the amount of the capital, at the rate of six per cent. is as compensation for

the services of the said *Moses Potter*, in lieu of clerk hire.
And further, that the said *E. M. Kerr* is to sign all bonds,
notes or other obligations, for the payment of money, or for
the performance of any contracts or engagements necessary to
be entered into, for the conducting of the said business, unless
the said *E. M. Kerr* should by special authority in writing, or
by power of attorney, put and appoint some one in his place so
to do.    And also, that the said *E. M. Kerr* shall be at liberty, at.
any time during the three years aforesaid, to sell out his in-
terest in, or take a partner or partners into the said business, if
the selling out or introducing a partner or partners into the
said business will not deprive the said *Moses Potter* of his
aforesaid share of the net profits, after deductings above men-
tioned.    And the said parties agree that either may withdraw
from this agreement, by giving to the other six months notice
in writing, of his intention so to do.    And it is further under-
stood by and between said parties, that if during the term
aforesaid, the said *Moses Potter* should die, and these articles
of agreement at the time of his death being then in full opera-
tion, and not altered as to notice as aforesaid, in regard to
withdrawal, then in such case, an account of sales is to be taken
up to the time of his decease, and his proportional part of the
profits, after the deductions as aforesaid, are to be paid to the
legal representatives of the said *Moses Potter ;*—the said ac-
count of sales to be made up as speedily after the decease of
the said *Moses Potter* as the business season will allow.    And
it is further agreed that the inventory of the stock in said
business, shall be taken each year at the following rates :

In witness whereof, the said parties have hereto signed their
names and affixed their seals, on the day and year above
written.

Signed and sealed, in the          EDW'D  M. KERR,  [*Seal.*]
    presence of          MOSES  POTTER,    [*Seal.*]

*S. H. Tagart.*"

The following letter from *Potter* to *Kerr*, was also filed with
the answer :—

"*Baltimore, February 3d,* 1846.

" *Dear Sir,*—You are hereby notified that I intend to and do hereby withdraw from the agreement of the 23d January, 1845, in relation to the business to be carried on at No. 250 *Baltimore* street, at the expiration of six months from this date.     Yours, very respectfully,     MOSES POTTER.

To *Edw'd M. Kerr, Esq. Baltimore.*"

Under an agreement for that purpose, a number of depositions and written evidence was taken and filed, to be used at the hearing of the motion to dissolve the injunction made upon the coming in of the answer. This evidence shows that the complainant occupied a position in the business, with the knowledge and consent of both parties, which made him as to third persons, a partner in the concern: and also, that the firm itself, if not actually insolvent, was in circumstances of great embarrassment; and that looking to the defendant's private engagements and responsibilities for other persons, his inability to carry on his business, and eventual insolvency, was almost inevitable.

On the 11th January, 1847, the Chancellor (JOHNSON) ordered the injunction to be continued until the final hearing,— and in his opinion accompanying this order, after stating the allegations of the bill and answer, and the effect of the proof taken, says:—

" The motion to dissolve the injunction has been argued with much ability on both sides, and the duty now rests with the court to decide upon it.

"In support of the motion it has been urged, that as the case now presents itself upon bill, answer and proofs, the plaintiff has no standing in court, because no partnership has been established, either as between the parties themselves, or as to third persons, it being conceded, as the defendant's counsel was understood, that if a partnership existed, the injunction should stand.

" Looking to the agreement of the 23d January, 1845, I should

have little difficulty in saying, that the parties *inter sese*, were not partners. It is true, there was to be a division between them of the net profits, in the proportion of three-fourths to one-fourth, and this stipulation, if unaffected by other provisions in the agreement, would clearly make them partners at least as to third persons; for it is not essential to such a relation, that there should be a participation in losses as well as profits. A contract to share the net profits in any proportion that may be agreed upon, will, to that extent, create a partnership, though the losses are to be borne by one of them exclusively. *Story on Partnership*, 28, *section* 23. *Gow on Partnership*, 15.

"But in this case, the parties whilst they agree to share the net profits of the business, also expressly stipulate that such agreement shall not make them partners, 'but that the allowance of one-fourth of the net profits after deducting the expenses of the business, and the interest upon the capital, shall be considered as a compensation for the services of the said *Moses Potter*, in lieu of clerk hire.'

"It is clear therefore, that whatever may be the effect of this contract upon the rights of third persons, the parties *inter se* cannot be regarded as partners. It is said, however, that even with reference to strangers, these parties are not to be considered as partners, notwithstanding the agreement as to the division of the profits, and the distinction between a stipulation to pay a given sum for services in proportion to a given *quantum* of profits, and a specific interest in the profits themselves *as profits*, is adverted to in support of this proposition. This distinction, it must be confessed, is a subtle and thin one, but it appears to be recognized as established law. *Hamper ex parte*, 17 *Ves.*, 404, 412. *Story on Partnership*, sec. 49.

"The agreement, however, in this case is not for a given sum in proportion to the profits, but is for a share of the net profits, as profits. And though it is said in the agreement, that this shall not make the plaintiff a partner, but is to be paid him in lieu of his services as clerk, this stipulation, so far as third persons are concerned, will not prevent his being considered a partner; for as to them, no such stipulation can protect him

from loss. *Hamper ex parte*, 17 *Ves.* 412. *Taylor vs. Terme & Janffret*, 3 *H. & Johns.* 505.

"If, however, the views of the defendant's counsel, in reference to the construction of the agreement, are correct, and the defendant looking to that paper alone, is not to be considered a partner to any extent, there are still circumstances in this case which impose that character upon him. The parties, it seems to me clear beyond dispute, were held out to the public as partners, in all the usual modes in which publicity is given to such associations. If this be so, then the relation existed, as to third persons, whatever may have been the private agreement of the parties themselves, unless with reference to those persons who had knowledge of the particular terms of the agreement. *Story on Partnership*, sec. 49.

"A partnership thus clearly existing as to third parties, whatever may have been the relation of the parties *inter sese*, the question presents itself, has the plaintiff under the circumstances of this case, a right to call upon the court for an account, and an injunction to prevent any apprehended misappropriation of the partnership effects, until the account can be taken?

"The dissolution of the partnership does not in my opinion, work any change in the rights of the parties in this respect. Each partner has a right, notwithstanding such dissolution, to insist that the partnership funds, shall be applied in the first place to the payment of the partnership debts. This right is recognized and enforced in equity, as a privilege or lien, and through it, the equity of the joint creditors is secured, to have their debts paid, in preference to the separate creditors of the respective partners. *Ex parte Ruffin*, 6 *Ves.*, 119, 126. *Story on Partnership*, sections 97, 326, 327. *Collyer on Partnership*, *B.* 2, *ch.* 1, *sec.* 1.

"This is an equity peculiar to the partners, at least so long as they remain solvent and the partnership is going on, and it is through this equity that the rights of the joint creditors are protected.

"In this case there would seem to be a peculiar propriety, in enforcing the priority which the partnership creditors are en-

titled to, through the privilege or lien which the partners enjoy, to have the funds applied to the satisfaction of the partnership debts. That the concern is insolvent or seriously embarrassed, is undeniable, and it is quite apparent that the defendant owing large sums on his own individual account, claims the right to apply the funds employed in the business to the payment, indiscriminately, of his private and his business engagements, to the manifest prejudice of the joint creditors. And this being so, the rights of those creditors to a priority of payment, will be defeated, unless the court, through the equity or lien of the plaintiff, as a partner, shall interpose for their protection.

" The partnership then being dissolved, and the concern greatly embarrassed, if not actually insolvent, and the defendant being by his own admission, unable to meet his private engagements, his notes not paid at maturity, and the process of attachment having, in some instances, been taken out against him, it would seem to follow, that it is the duty of this court to interpose at the instance of either of the partners, for the protection of the creditors.

"Unless protected in this mode, it may be doubted whether any protection can be afforded them at all, as the lien or equity does not attach to them, but to the partners, through whom the right of priority of the joint creditors is worked out and maintained.

. " But independently of this right of the plaintiff as a partner, to insist upon the prior application of the partnership estate to the payment of the partnership debts, there is another ground upon which the bill may be supported. The plaintiff, as appears by the agreement, though not a partner, so far as he and the defendant were concerned, was yet entitled to one-fourth of the net profits of the business; and the connection being terminated and the business broken up, he is entitled to an account of those profits, and perhaps, a lien or preference in respect of them, over the private creditors of the defendant. *3 Kent Com. 25, note b, 4th ed.*

" It has been argued for the defendant, that the plaintiff has an adequate remedy at law upon this agreement, and there-

fore, his application should not be entertained by this court. But is this so? To ascertain the net profits of the business, the partnership accounts must be taken, which could not be done conveniently, satisfactorily, and fairly by a jury, in the course of a trial at *nisi prius*. That matters of account are subjects over which courts of law and equity have concurrent jurisdiction is established, and it is well settled that the equity tribunals have no jurisdiction where a plain, adequate and complete remedy may be had at law. *Richardson vs. Stillinger,* 12 *G. & J.* 477.

" This then being a bill for an account, and of a character in which the legal remedy, if there be one at all, would be full of difficulty, inadequate and incomplete, the power of this court over the subject would seem to be clear. Being of opinion, that this court has jurisdiction over the subject, the next question which arises is, as to the extent to which the power of this court should be carried, at this stage of the cause.

" The bill prays for an injunction, and· the appointment of a receiver, upon the ground chiefly of the right claimed by the defendant, to apply the joint property of the concern to the payment of the claims of his private creditors; and the answer, though it emphatically denies the partnership, does not deny the claim of, or the exercise of this right; nor does it deny, but on the contrary admits, that if these private engagements of the defendant are pressed upon him, being engagements resulting from the loan of his paper to a mercantile firm in *Baltimore,* he will not only be broken up in his business, but rendered insolvent.

" This is a case, therefore, where the partnership, which certainly existed as to third persons, is at an end, the business suspended, and the right claimed and exercised by one of the partners, to apply the funds, which should be applied to the payment of the joint creditors, to the payment, indiscriminately, of them and his individual creditors.

" That a Court of Chancery will, under such circumstances, interpose by injunction, and put a receiver upon the property,

is, I think, established by authority. *Story on Partnership*, sections 227, 228, 229.

" If the view taken by the court is correct, that these parties as to third persons, were partners,—that being partners, the complainant has a right to insist that the partnership effects shall be applied to the satisfaction of the joint creditors; that this right is recognized in equity as a lien, through which the equity of the joint creditors to have their claims first paid, can be enforced, it would seem to be the duty of the court to preserve the property from misappropriation by the partner in possession of the partnership effects, and to place those effects in the hands of a receiver, that the proper application may be made of the property, and the concern wound up. *Gow on Partnership*, ch. 2, sec. 4, 3d ed.

" It has been ingeniously urged in the argument of the defendant's solicitor, that the complainant can have no relief upon the ground of his liability to the creditors, or any equity which they may have through him, to have their claims paid in preference to the individual creditors of *Kerr*, because, having planted himself in his bill exclusively upon his title as a partner *inter se*, he must maintain himself upon that ground, and can resort to no other. But the complainant does in his bill, allege his liability as a partner to the creditors of the firm, and that if the application by *Kerr* of the partnership effects to his individual debts is permitted, the partnership creditors will be greatly injured, and he himself utterly ruined. And although the defendant denies that the complainant is a partner, he does not deny the injury to the creditors of the firm, if his individual debts are paid out of its property. It is true, the bill does not allege as a distinct ground of equity, the right of the partnership creditors to seek through the lien of the complainant as a partner, so far as they are concerned, a priority over the private creditors of the defendant; but the facts being stated, upon which this equity of the creditors rests, that equity may be enforced, though not expressly alleged in the bill, as a ground for the action of the court.

" This equity is not a matter *of fact*, which the party must

allege, but a conclusion of law or equity, to be drawn by the court from the statement of facts which give rise to it. *Gibson et al. vs. McCormick,* 10 *G. & J.* 65, 109.

" Having then, after a careful consideration of the circumstances of this case, duly weighing the arguments of the counsel, come to the conclusion, that the plaintiff is entitled to relief in this court, and that justice requires the continuance of the injunction, I shall pass an order to that effect, and incline to the opinion, that a receiver should be appointed, as soon as a proper person is recommended, to the end that the affairs of the partnership may be wound up, and its property and funds collected and distributed, according to the rights of all parties concerned."

An application was then made for the appointment of a receiver; and the Chancellor (JOHNSON) on the 1st February following, passed an order for that purpose, accompanying which he delivered the following opinion:—

" The application for the appointment of a receiver in this case, has been brought before the court by the consent of parties, and their respective solicitors have been fully heard.

"Looking to the nature and extent of the injunction granted by my predecessor on the 8th September, 1846, and continued by my order of the 11th instant, it is difficult to see how the appointment of a receiver can be refused, without material injury to the parties concerned, unless indeed the injunction itself shall be essentially modified.

" It restrains the defendant, *Kerr,* who is in possession of the property and effects of the concern, from selling or disposing of any of the goods and effects of the partnership, or collecting any debts due thereto, or negotiating any bill or note, or contracting any debt whatever on account thereof. In short, it puts a complete stop to the business of the firm, a condition of things, which cannot be continued without great deterioration and loss to all parties having an interest therein.

" If therefore I should conclude not to appoint a receiver to take charge of this property, and make it available to those, to whose benefit it should be applied, I should consider it my

duty, either to dissolve the injunction or so to modify it ' as to avoid these injurious consequences.' The power of the court should never be exercised merely in inflicting injuries, though it sometimes happens in the application of principles designed to advance the general purposes of justice, the interests of individuals are made to suffer.

" The argument upon the present application for a receiver, has, no doubt necessarily involved the question of the propriety of continuing the injunction; a point heretofore adjudged by the court, and I have, from a sense of duty, as well as from inclination, carefully reconsidered the grounds upon which I proceeded in passing that order, with an anxious desire to arrive at just conclusions upon the subject.

"It was my deliberate judgment formed then, and remaining still, that these parties, plaintiff and defendant, as to third persons, must be regarded as partners. Independently of other authorities, in support of this opinion, the case of *Taylor vs. Terme and Janffret,* 3 *Harr. & Johns.* 505, it seems to me is perfectly conclusive.—In that case the defendant *Terme,* was employed by the other defendant *Janffret,* as a clerk and book-keeper, and had no control or management of the business in any other capacity; and yet, because he received a share of the profits, instead of a stipulated salary, he was held liable as a partner, though the plaintiff only knew him as such clerk or book-keeper, and the note upon which suit was brought, was given by *Janffret* alone.

" It was admitted by the very eminent counsel who argued that case for the defendant, that the *English* decisions cited by the plaintiff's counsel, established the position, that where a person derives a benefit from the trade in which another is engaged, by receiving a portion of the profits, he is liable as a partner, although he carefully stipulates, that he is not to be so liable, and the effect of the decisions was attempted to be obviated upon the ground, that being made since the revolution, they were not binding upon the court.

" Being then partners, to the extent of rendering both liable for the engagements of the concern, a dissolution having taken

place, and insolvency impending, if not actually existing, and it being charged and not denied, that the defendant was misapplying the partnership funds, to the payment, indiscriminately, of his individual, as well as the partnership debts, it seemed to me a case was presented, in which it was the duty of the court to interfere. In deciding upon the motion to dissolve the injunction, authorities were cited to show, that each partner upon the dissolution of the partnership, has a perfect right, in the first place, to require that the partnership funds shall be directly and regularly applied to the payment of the partnership debts, and that as between them there is a lien, or at least an equity, which through the partners, may be applied in favor of creditors, though as to the latter it may not attach, by virtue of their original claims, in all cases. *Story on Partnership, sections* 97, 326, 327.

"The evidence clearly shows that the business of this concern is surrounded by serious embarrassments, if not insurmountable difficulties. The affairs of the partnership, under these circumstances, are brought into a Court of Chancery to be there administered, and this court, it is believed, has jurisdiction over the subject, not only as a matter of account between the parties, but upon that principle of equity, by which the partnership creditors, through the plaintiff, the suing partner, have a right to insist, that the partnership funds, shall be applied in the first place, to the payment of their claims, in preference to the individual creditors of the respective partners.

"That the separate creditors can only look to the surplus, after the satisfaction of the joint creditors in a court of equity, has been decided by the Court of Appeals, and, of course, is a position not open for controversy. *McCulloh vs. Dashiell's adr.*, 1 *H. & G.* 96, 106. In the case of *Hazzard vs. Hazzard*, 1 *Story Rep.* 371, cited by the defendant's counsel, the rights of creditors are not at all involved, as they are in this case, not only by the averments of the bill, which show the danger to which they are exposed, by the division of the partnership funds, to the payment of the separate creditors of the defendant, but by the silence of the answer in regard to that allegation,

and its statements in reference to the attachments which those creditors were prosecuting against him. In *Hazzard vs. Hazzard*, the complainant put his right to an account, upon the distinct and sole ground of his being a partner, and Mr. Justice *Story* being of opinion that the parties *inter sese* were not partners, and consequently that the allegations and proofs did not correspond, dismissed the bill.

" In this case, the plaintiff not only asks for an account, as a partner, but he alleges the danger to partnership creditors from the conduct of the defendant, and his own danger and entire ruin, if by reason of the misapplication of the partnership funds by the defendant, those creditors are thrown upon, or have recourse to him, as we have seen they have a clear right to do. This case then, I think, is essentially unlike the case decided by Judge *Story*.

" It has been argued, that the court should at any rate, do no more than restrain the defendant, from applying the joint property (if it be joint) to the payment of his separate debts, and that the joint creditors should be left, from time to time, as the circumstances may render necessary, to apply to the court for the protection of their interests. But would not this course be most inconvenient, and tend to multiply litigation to a very unnecessary extent?

" The joint creditors or plaintiff must be kept constantly on the alert, to prevent a violation of the injunction, which might be done to a great extent, without the risk of detection, and for every attempt of the separate creditors to secure the payment of their claims, to the prejudice of the joint creditors, a bill in equity would have to be filed. It would produce the same inconvenience, which the Lord Chancellor in *ex parte Elton*, 3 *Ves.* 238, deprecated.

" A case has been cited in this argument, which was not referred to, in the argument of the motion to dissolve the injunction, which in its essential features is very much like the case we are considering. It is the case of *ex parte Digby*, and *ex parte Buckston*, in 38 *Eng. Com. Law Rep.* 495. The question in that case was, between the assignees under a separate,

and the assignees under a joint *fiat,* and the rights of these assignees depended upon, whether a partnership was shewn to exist, between *Shackleton* and *Blenkin.* The business it appears was carried on in the sole name of *Blenkin,* and that *Shackleton* had been retained by him, as a clerk, or agent, at a salary of £100 a year; but, that afterwards, by a new arrangement between the parties, *Shackleton* was to have a moiety of the profits of the business, as a compensation for his services. There was no agreement in writing, constituting him a partner, nor any entry in the books of the business, from which that circumstance could be implied; and it did not appear, that he brought any capital into the concern, or had any interest in the stock in trade, which was purchased with the separate money of *Blenkin,* and while the alleged partnership was going on, *Shackleton* carried on a separate trade, as a dealer in hops.

" Under these circumstances, the court impounded the separate *fiat,* to give effect to the subsequent joint *fiat,* being of opinion that the arrangement constituted a partnership as to their liabilities, to third persons, and that even if the question was doubtful, a joint commission was never superseded by a separate commission, without sending the disputed fact of partnership to be determined by a jury. And in the case referred to, *Sir G. Roye* said, it appeared to him, the property was joint, and it was the duty of the court, to see how far the rights of all the creditors could be preserved, and that it was the habit of the court in such cases, ' to get the separate *fiat* out of the way of interfering with the joint *fiat,* or impeding the administration of the joint assets, for the general benefit of the joint creditors.' If this then, was a case in bankruptcy, depending in the *English* courts, there can be little or no doubt, that the assets of this firm would be administered under a joint commission, and applied to the payment of the joint creditors, in preference to the separate creditors of *Kerr.* It is said however, that in this case, there is neither the death of either of the parties, bankruptcy, or technical insolvency; and that the rule which gives joint property to the joint creditors, and separate property, to the separate creditors, only applies

to such cases.   There is, to be sure, in this case, neither death, bankruptcy, or technical insolvency, but there is actual insolvency, and an intention ,charged, and not denied on the part of the defendant, to treat the property of this concern as separate property, and to apply it accordingly.   This, the Court of Appeals have said, in the case of *McCulloh vs. Dashiell,* 1 *H. & G.* 106, is contrary to the equitable rule, which declares that, the separate creditors can only look to the surplus of the joint fund, after the satisfaction of the joint creditors.   Though I have given to this case a very careful consideration, and have had the benefit of able arguments on both sides, it is very possible I may have fallen into error in the conclusion to which my judgment has conducted me; but in that event I have the satisfaction to know, that the legislature of this State, affords the means, by which the party against whom the decision is made, may take that decision to a superior tribunal, where the error, if one has been committed, will be corrected.   The act of 1835, chapter 346, and 380, gives the remedy in regard to the injunction, (upon which the order for a receiver depends) but as that remedy has not been pursued, I consider it my duty to appoint a receiver, and shall  pass an order for that purpose.

" Though the depositions taken and filed, since the last order have been read, they have not been adverted to in the foregoing observations, nor are they relied upon in support of the order about to be passed, because I am not satisfied, that they were so taken, as to make them evidence.   *George M. Gill, Esq.* is recommended as a fit person to be appointed receiver by a large number of creditors, and it is understood there is no objection to him, he will therefore be appointed."

From these several orders, granting and continuing the injunction, and appointing a receiver, the defendant appealed to this court.

The cause was argued before Dorsey, C. J., Spence, Martin and Magruder, J.

By Wm. Schley for the appellant.

By Geo. M. Gill and John Nelson for the appellee.

SPENCE, J. delivered the opinion of this court.

The question upon which this case entirely depends, is, whether *Kerr* and *Potter*, stood in the relation to each other of partners *inter se.* If they stood in this relation to each other, the order of the Chancellor granting the injunction, the order continuing the injunction, and the order appointing a receiver were all, and each of them correct, if not, erroneous.

In the examination of this question, all that class of cases in which courts of equity have adjudged the parties to be partners in relation to third persons, are left out of view. This controversy is one to which the creditors are not parties, but one in which *Potter* claims to be an actual partner of *Kerr*, and entitled to the rights and equities of a partner *inter se.* It can only be upon the hypothesis, that *Potter* is a partner of *Kerr*, and holding with him a community of rights and interests in the capital stock and effects of the concern, which creates his lien from which his equities arise. Otherwise his claim can present no other reason, or ground for the interposition of a court of equity, on the ground of lien, than that of any other creditor of *Kerr.*

We will enquire, whether upon the authorities, when applied to the evidence in this cause, *Kerr* and *Potter*, stood in the relation to each other of partners *inter se.* Chancellor *Kent*, in the 3d *vol.* of his *Commentaries, page 32*, says "there is a just and marked distinction, between partnerships as respects the public, and partnerships as respects the parties; and a person may be held liable as a partner to third persons, although the agreement does not create a partnership between the parties themselves." At *page 27*, the same author says, " actual intention is requisite to constitute a partnership *inter se.*" *See* 1 *Story's Rep.* 371, *Hazzard vs. Hazzard.*

This is not one of those cases so frequently found in the books, where courts, to ascertain the intention of the parties, are obliged to form their conclusions by deductions, drawn by analogy from principles of law applied to the facts and circumstances. The parties themselves in their articles of agreement of the 23d January, 1845, have declared their intention in the

most unequivocal language, as follows:  "And it is hereby declared to be the meaning of the articles of agreement aforesaid, that thereby the said *Moses Potter* is not made a partner in trade, of the said *E. M. Kerr*, but that the allowance of one-fourth of the net profits, after deducting the expenses of the business, and also deducting interest on the amount of the capital at the rate of six *per cent.* is a compensation for the services of the said *Moses Potter*, in lieu of clerk hire."   We think this declaration and the explanation showing they are not partners *inter se*, in the articles of agreement are conclusive of this question.   It was insisted in the argument, that if *Potter* were held liable for the debts of the concern, and not to be treated as a partner *inter se*, and entitled to all the rights and equities as such, would be unfair and fraudulent.   The answer to this is, that *Potter* might have known that he was not the actual partner of *Kerr*, and if he performed acts himself, or stood by and saw others perform them, which would render him liable to the creditors of the establishment, the credit given was voluntary, and gave him no other equity than would result to any other individual, who had become responsible for *Kerr's* indebtedness.

But it was insisted, that this liability of *Potter* to the creditors, gave them an equity to come upon the partnership stock and effects, and the case of *ex parte Digby and ex parte Buckston, in* 38 *Eng. Com. Law Rep.* 495, was relied on as maintaining this doctrine.   This was a case in bankruptcy, and the controversy was between the assignees under the joint *fiat*, and the assignees under a separate *fiat*.   A controversy in fact between the representatives of the joint creditors on the one hand, and the separate creditors on the other.   The assignees under the separate *fiat* praying that the joint *fiat* might be annulled, and the assignees under the joint *fiat* that the separate *fiat* might be superseded.   Now, as we have before stated, this is not a controversy between creditors, involving the question of joint and separate claims, but is simply one involving the question whether *Potter* was the actual partner of *Kerr*, and had a lien on the stock and effects of the concern.

If this were an application by a creditor charging that *Kerr* and *Potter* were partners in trade, and that he was a creditor of the firm, the dissolution and the insolvency of the firm, and the improper appropriation of the funds of the firm to the payment of the separate creditors, there might be some analogy.

We think, therefore, upon the case as made by the bill, answers, exhibits and proof, there is error in the Chancellor's order awarding the injunction, the order continuing the injunction, and the order appointing a receiver.

In this case we do not decide any question as to the rights of creditors.

The Chancellor's orders are reversed, and the cause remanded, that an account may be stated of the profits, while *Potter* acted as clerk or salesman of *Kerr*.

**ORDERS REVERSED AND CAUSE REMANDED.**

DORSEY, C. J. dissented.